**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83837-7-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| RENE MAYA ESTRADA, | |
| Appellant. | |

MANN, J. — Rene Maya Estrada[1] was convicted of first degree rape. He appeals and argues that the (1) the lack of a Petrich[2] instruction violated his constitutional right to a unanimous jury, and (2) the admission of multiple hearsay statements violated Evidence Rule (ER) 802 and his constitutional right to a jury trial. We affirm.

I

In October 2019, 17-year-old B.S.G.'s[3] parents allowed Maya Estrada, who was homeless at the time, to stay in the living room of their apartment. Shortly after Maya

---

[1] The trial court caption and record sets out the defendant's last name with a hyphen. Defendant's appellate brief omits the hyphen. As hyphens are not associated with traditional naming conventions in Spanish-speaking communities, we refer to him by his complete unhyphenated last name.

[2] State v. Petrich, 101 Wn.2d 566, 572, 683 P.2d 173 (1984), abrogated on other grounds by State v. Kitchen, 110 Wn.2d 403, 756 P.2d 105 (1988).

[3] We use the victim's initials to protect her privacy and dignity. RCW 7.69.010.

Estrada came to stay, B.S.G. came home from work and was alone with Maya Estrada in the apartment. While B.S.G. was in her bedroom, Maya Estrada approached her from behind with a knife. Maya Estrada instructed B.S.G. to do what he said or he would kill her. Maya Estrada then covered B.S.G.'s mouth and held the knife to her stomach. Maya Estrada removed B.S.G.'s shirt, bra, pants, and underwear. He then told her not to shout and threw her on the bed while he continued to hold the knife. Maya Estrada then got on top of B.S.G. and covered her face with a pillow so that she couldn't scream. Maya Estrada told B.S.G. to do as he said then put his penis in B.S.G.'s mouth, kissed her, and touched her body with his mouth and hands. These events took about 30 to 45 minutes.

After Maya Estrada heard sounds coming from the stairs outside the apartment, he left the bedroom to take a look. Maya Estrada then returned to B.S.G.'s bedroom, tossed some clothes at her, and demanded that she get dressed and come with him. In fear for her life, B.S.G. put on a shirt and shorts but no bra or underwear and went with Maya Estrada to the laundry room located downstairs from the apartment. In the laundry room, Maya Estrada took out his penis; B.S.G. started to cry and said no. Maya Estrada then hit B.S.G. in the chest and put his penis in her mouth.

When the headlights of a car parking at the apartment building shone into the laundry room, Maya Estrada left and went upstairs. B.S.G. ran from the laundry room and approached a woman nearby, later identified as Martha Ramirez, asking for help. Ramirez testified that B.S.G. was running and crying and appeared "all stressed out, like in shock." B.S.G. was wearing only one sock and no shoes. Ramirez took B.S.G. to her apartment where B.S.G. asked to use the bathroom because she wanted to throw

up and was feeling very nauseous. Ramirez testified that B.S.G. was trying to throw up, but couldn't so instead rinsed her mouth out with water. Ramirez and her son then called 911 and reported that there was a girl there that said someone is going to kill her. The caller told the 911 operator that the girl reported that the person was touching her breast and had a knife. B.S.G. talked to the responding police officers and was then taken to the hospital where she had a sexual assault examination.

A few days later, Maya Estrada approached B.S.G. while she was at work. B.S.G. called 911 and Federal Way Police officers responded and arrested Maya Estrada.

Maya Estrada was charged with rape in the first degree under RCW 9A.44.040(1). Maya Estrada was also charged under RCW 9.94A.825 and 9.94A.533(4) with being armed with a deadly weapon, a knife, at the time of the rape.

A jury trial was held over nine days in the fall of 2021. The jury heard testimony from the responding police officers and Federal Way Police Detective Mathew Novack. The sexual assault nurse, Chelsea Reed, testified about her examination of B.S.G. on the night of the rape. She testified that B.S.G. answered a battery of question. B.S.G. told her that Maya Estrada put a knife on her stomach and put his penis in her mouth in the bedroom, and then, after dragging her down to the laundry room, threatened her again with the knife and again put his penis in her mouth. Reed testified that B.S.G. answered "no" as to whether she had washed her mouth out or vomited since the incident.

The neighbor, Ramirez, testified about her encounter with B.S.G. and calling 911. Ramirez testified that B.S.G. told her that when she got home there was a man inside

-3-

her house, and that he threatened her and forced her with a knife to the laundry room and forced her to perform oral sex.

B.S.G. testified to the following events. She explained that when she arrived home she went to her bedroom and felt Maya Estrada come up behind her with a kitchen knife and then covered her mouth and put the knife toward her stomach. He then undressed her and threw her onto the bed while holding the knife, climbed on top of her, and then put his penis in her mouth and that it tasted salty. B.S.G. testified that after hearing noises outside, Maya Estrada got up and left to go look. After he came back, he threw some clothes at her and told her to get dressed. B.S.G. testified that she was still scared he was going to kill her, but didn't remember if she saw a knife. B.S.G. testified that she could not remember how she got to the laundry room, but once there he hit her in the chest and put his penis in her mouth again. B.S.G. testified that she did not remember too well the events that took place in Ramirez's apartment and said, "The thing is that I don't remember well. I remember that I threw up in her bathroom, but I don't remember if she was or not with me."

Maya Estrada did not testify or present witnesses. He instead denied the allegations and focused on B.S.G.'s credibility.

The jury was instructed that "to convict" Maya Estrada for first degree rape under RCW 9A.44.040(1) each of the following must be proved beyond a reasonable doubt:

> (1) That on or about October 12, 2019, the defendant engaged in sexual intercourse with B.S.G.;
> (2) That the sexual intercourse was by forcible compulsion;
> (3) That the defendant used or threatened to use a deadly weapon or what appeared to be a deadly weapon; and
> (4) That any of these acts occurred in the State of Washington.

-4-

> If you find from the evidence that elements (1), (2), (3), and (4), have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of elements (1), (2), (3), or (4), then it will be your duty to return a verdict of not guilty.

The jury instructions did not include a Petrich unanimity instruction.

The jury found Maya Estrada guilty of rape in the first degree. The jury did not decide the deadly weapon enhancement special verdict.

Maya Estrada moved for a new trial first arguing that a Petrich instruction was required because a reasonable juror could have believed the rape happened at one location, but not the other, and in believing so they may not have been unanimous about which incident met the first degree rape requirements. Maya Estrada also argued that his due process rights were violated because the jury did not decide the deadly weapon enhancement special verdict thus proving he was not convicted beyond a reasonable doubt of every element of the crime charged.

The trial court denied Maya Estrada's motion for a new trial. Maya Estrada appeals.

II

Maya Estrada was charged with one count of rape. He asserts that because the State presented evidence of two distinct acts, the State should have elected which act they were relying on or, the jury should have been instructed to agree on a specific criminal act. Maya Estrada argues that his constitutional right to a unanimous jury was violated by the lack of a Petrich instruction. We disagree.

A

Criminal defendants have a right to a unanimous jury verdict. WASH. CONST. art. I, § 21; State v. Ortega-Martinez, 124 Wn.2d 702, 707, 881 P.2d 231 (1994). When the State presents evidence of multiple acts that could constitute the crime charged, it generally must either tell the jury which act to rely on in its deliberations, or the court must instruct the jury that it has to unanimously agree on which specific act supports the conviction. State v. Kitchen, 110 Wn.2d 403, 409-11, 756 P.2d 105 (1988). The former is known as an "election" and the latter is known as a Petrich instruction after the case in which the instruction originated. State v. Petrich, 101 Wn.2d 566, 572, 683 P.2d 173 (1984), abrogated on other grounds by Kitchen, 110 Wn.2d at 403. Whether a Petrich instruction was required is reviewed de novo. State v. Boyd, 137 Wn. App. 910, 922, 155 P.3d 188 (2007).

Failure to make an election or give a Petrich instruction can be constitutional error because of "the possibility that some jurors may have relied on one act or incident and some another, resulting in a lack of unanimity on all of the elements necessary for a valid conviction." Kitchen, 110 Wn.2d at 411. Neither an election by the State nor a Petrich instruction is required where multiple acts form a continuing course of criminal conduct. State v. Handran, 113 Wn.2d 11, 17, 775 P.2d 453 (1989).

To determine whether criminal acts are a continuing course of conduct, facts are evaluated using common sense. Handran, 113 Wn.2d at 17. We consider "whether the evidence shows conduct occurring at one place or at many places, within a brief or long period of time, and to one or multiple different victims, and whether the conduct was intended to achieve a single or multiple different objectives." State v. Lee, 12 Wn. App.

-6-

2d 378, 393, 460 P.3d 701 (2020).  Typically, a continuing course of conduct is "an ongoing enterprise with a single objective."  State v. Love, 80 Wn. App. 357, 361, 908 P.2d 395 (1996).  On the other hand, different times, locations, and parties suggest multiple acts.  State v. Brown, 159 Wn. App. 1, 14, 248 P.3d 518 (2010).

In Handran, for example, Handran was seen climbing in the window of his ex-wife's apartment.  113 Wn.2d at 13.  The victim woke to find Handran leaning over her, nude, and kissing her.  Handran, 113 Wn.2d at 13.  After she demanded he leave, he pinned her down, offered her money, and hit her in the face.  Handran, 113 Wn.2d at 13.  Handran argued on appeal that the trial court erred in failing to give a unanimity instruction because the jury could have found that the assault was his kissing the victim or his hitting her.  Handran, 113 Wn.2d at 17.  Our Supreme Court disagreed, explaining:

> Handran's alleged criminal conduct occurred in one place during a short period of time between the same aggressor and victim.  Under a commonsense evaluation of these facts, the actions evidence a continuing course of conduct to secure sexual relations with his ex-wife, whether she consented or not, rather than several distinct acts.

Handran, 113 Wn.2d at 17.

This court has recently addressed the need for a Petrich instruction in two opinions.  In Lee, the defendant Lee strangled the victim in the kitchen while verbally threatening her.  Lee then stopped only to continue the same actions in the living room then again in the bedroom where the defendant penetrated the victim digitally and with his penis.  12 Wn. App. 2d at 384-85.  Lee argued that because there were multiple distinct acts of penetration and the prosecution did not make an election at trial, there

should have been a Petrich instruction. Lee, 12 Wn. App. 2d at 396. This court

disagreed, explaining,

> Lee's acts of sexual penetration involved the same victim, K.H., occurred in one place, K.H.'s bed, occurred within a brief period of time, less than 10 minutes, and occurred for the single purpose of Lee's sexual gratification. Lee's acts were plainly a continuing course of conduct, and no election or unanimity instruction was required.

Lee, 12 Wn. App. 2d at 397.

In contrast, in State v. Aguilar, 27 Wn. App. 2d 904, 911-13, 534 P.3d 360

(2023), Aguilar broke into his ex-girlfriend's apartment and embarked on an overnight

binge of emotional, physical, and sexual violence. On appeal, Aguilar argued that the

testimony described two distinct incidents of rape—his sexual assault of the victim on

the couch, and the later sexual intercourse in the bedroom—but the jury was not given a

unanimity instruction. Aguilar, 27 Wn. App. 2d at 922. This court agreed, explaining:

> We conclude that the facts here are consistent with multiple acts rather than a continuing course of conduct. The relevant conduct occurred in A.B.'s apartment and A.B. was the only victim, facts that admittedly indicate a continuing course of conduct rather than multiple acts. But the timeline of events, although uncertain, indicates that numerous activities may have intervened between the events on the couch and in the bedroom. Some of these activities—searching for and doing drugs, pretending to sip wine—appear to have been somewhat prolonged endeavors. And Aguilar's state of mind does not demonstrate the existence of "an ongoing enterprise with a single objective." [State v. Garman, 100 Wn. App. 307, 313, 984 P.2d 453 (1999)]. Instead he acted erratically under the influence of intoxicants, his focus shifting rapidly from one thing to another.

Aguilar, 27 Wn. App. 2d at 926.

The facts here appear more like Lee and Handran than Aguilar. The events

occurred between the same defendant and victim, in the same general vicinity, and over

a length of time. While, like Aguilar, there was an intervening event where Maya

-8-

Estrada became worried about getting caught and forced B.S.G. to dress and move downstairs to the laundry facility; unlike Aguilar, the intervening event was short and there was no change in activity. Maya Estrada simply stopped what he was doing, forced B.S.G. to change locations, and then continued the same activity previously interrupted. Under a commonsense evaluation of the facts, Maya Estrada's actions evidence a continuing course of conduct to threaten B.S.G. with a knife and forcibly secure oral sex without her consent.

III

Maya Estrada also challenges the trial court's admission of three hearsay statements made by responding officers testifying at trial. First, he argues that the trial court erred by admitting the statements because the purpose for which the statements were admitted was irrelevant. He also contends that the statements were improperly admitted because they spoke to the ultimate issue of guilt and invaded the province of the jury. While we agree that the statements were both hearsay and irrelevant, any error was harmless beyond a reasonable doubt.

A

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. ER 801(c). "Where an out-of-court statement is offered for the truth of what someone told a witness, the statement is hearsay." State v. Rocha, 21 Wn. App. 2d 26, 31, 504 P.3d 233 (2022). Hearsay statements not offered for their truth but for another relevant purpose may be admitted. State v. Aaron, 57 Wn. App. 277, 280, 787 P.2d 949 (1990). That said, hearsay statements not offered for their truth are inadmissible if the purpose for which they are offered is irrelevant. Rocha, 21 Wn. App. 2d at 31-32.

-9-

Whether a statement is hearsay is reviewed de novo.  State v. Heutink, 12 Wn. App. 2d 336, 356, 458 P.3d 796 (2020).  Whether the admission of hearsay violates a constitutional right is reviewed de novo.  State v. Price, 158 Wn.2d 630, 638-39, 146 P.3d 1183 (2006).

B

Officer Nicholas Wong was asked what information he had "from dispatch as to what had occurred?"  Maya Estrada objected based on hearsay.  After the State argued that the statement was not offered for the truth, the trial court instructed the jury that they could not consider the response for the truth of the matter:

> The answer to this question is going to be hearsay, so it's not substantive evidence.  You can't consider it for the truth of the matter.  You can only consider it for the impact on the here or the person that heard it.

Officer Wong then responded: "I believe the dispatcher had spoken of a sexual assault involving a knife."  (Emphasis added.)

Officer Christopher Cabrera was asked how he got involved in the incident.  He responded:

> A dispatch basically to the sector vehicles as a—it originally came out, I believe, as a suspicious subject, and eventually a little bit more information started coming out due to the language barrier, they had to translate over to a Spanish translation and to be able to get any more information that's coming out.
>
> So, sometimes any type of information that comes out towards us and dispatch is not always up to date and current until they get that extra translation when it comes out to that.  So, once the translation came out where it came of an incident that occurred the night prior and it was matching the same subject as that incident, that's when multiple units throughout the whole city actually started responding to that location, because of the seriousness of the offense that occurred the night prior.

 (Emphasis added.)

After Maya Estrada objected and moved to strike Officer Cabrera's last comment, the trial court again instructed the jury that it could not consider the statement for the truth of the matter asserted:

> So, I'll instruct the jurors that you can only consider it for that basis as to why the police responded the way they did, and not for the truth of the matter asserted.

Officer Hilary Mariana was then asked how her involvement started. She responded that "the call came out as a <u>sexual assault with a weapon</u>." (Emphasis added.) In response to Maya Estrada's objection, the trial court again instructed the jury:

> Any reference by this officer to what she heard from some other person, at least in this answer, is hearsay and is not substantive evidence. You cannot consider it as evidence. You can only consider it for what this officer did next.

C

Maya Estrada first relies on <u>Rocha</u> and argues that why officers did what they did was irrelevant and thus the statements were improperly admitted hearsay testimony. In <u>Rocha</u>, the trial court allowed officers to testify about information received from dispatch and that their response to the location was based on a "domestic situation." 21 Wn. App. 2d at 30. On appeal, the court concluded that the statements were irrelevant and allowed in error because why officers went to the gas station was of no consequence at trial and could only be relevant to support that the defendant fought with the victim thus he acted with malice which was an element of the crime. <u>Rocha</u>, 21 Wn. App. 2d at 32.

Here, the trial court similarly allowed police officer statements that they responded to a "sexual assault" not for the truth but to explain why they did what they

did. Like Rocha, why officers went to the scene and their state of mind at the time were not at issue at trial. Because the specific information received from dispatch was irrelevant, we conclude the statements that they were responding to a "sexual assault" were irrelevant and improperly admitted hearsay.

Maya Estrada also contends that the testimony of a "sexual assault involving a knife," that there was a "serious[] . . . offense that occurred," and that there was a "sexual assault with a weapon," amounted to opinion testimony on the ultimate issue of guilt and invaded the province of the jury in violation of article I, sections 21 and 22. WASH. CONST. art. I, §§ 21, 22. It is unclear from Maya Estrada's arguments how the officers' hearsay statements amounted to opinions of his guilt. While the statement might opine that a sexual assault occurred with a weapon, and that the crime was serious, none of the testimony concluded that Maya Estrada committed the crime. We generally do not address unsupported constitutional arguments. Havens v. C & D Plastics, Inc., 124 Wn.2d 158, 169, 876 P.2d 435 (1994). But here, as discussed below, even if the statements were improper under Washington's constitution, they were harmless beyond a reasonable doubt.

D

Nonconstitutional error is harmless if 'there is a reasonable probability that, without the error, the outcome of the trial would have been materially affected." Rocha, 21 Wn. App. 2d at 34 (internal quotation marks omitted) (quoting State v. Gower, 179 Wn.2d 851, 854, 321 P.3d 1178 (2014)). "Constitutional error is harmless only if the State establishes beyond a reasonable doubt that any reasonable jury would have

-12-

reached the same result absent the error." State v. Quaale, 182 Wn.2d 191, 202, 340 P.3d 213 (2014). Both standards are met here.

Maya Estrada relied on a general denial and focused on the lack of any semen in the swabs taken from B.S.G.'s mouth and breast, and the lack of DNA evidence in B.S.G.'s mouth swab. But the lack of DNA evidence in B.S.G.'s mouth swab is at best inconclusive. B.S.G. only testified that Maya Estrada's penis in her mouth tasted salty, she never claimed that Maya Estrada ejaculated. Also, the State's DNA expert, Christine Vo, explained that because of the high turnover rate of cells in a person's mouth due to the constant making of saliva and swallowing, it is highly unlikely for DNA from external sources to stick around in the mouth for a long time. And as such, it is "rare to get DNA from another person on oral swabs if those swabs haven't been collected very quickly after the alleged incident, and if not very much, DNA is left behind." And further, there was mixed testimony as to whether B.S.G. vomited or rinsed her mouth after the event. B.S.G. testified that she thought she vomited at Ramirez's apartment, but she told the sexual assault examination nurse that she did not. Ramirez, however, testified that B.S.G. tried to vomit but could not and rinsed her mouth out with water.

More importantly, the swab taken from B.S.G.'s breast revealed the presence of saliva, and DNA testing overwhelmingly revealed that Maya Estrada was a contributor to the DNA mixture.[4] Further, B.S.G. testified in detail to the event, including identifying

---

[4] Forensic scientist Dr. Gina Dembinski explained that assuming B.S.G. was one of the contributors to the DNA mixture found on her own breast, it was 710 octillion times more likely that the mixture came from B.S.G. and Maya Estrada as opposed to B.S.G. and an unrelated individual selected at random.

Maya Estrada in court, and was subject to cross-examination. Her testimony was also supported by the testimony from the sexual assault examination nurse and responding neighbor. Considering the untainted evidence, any error in admitting the officers' statements was harmless beyond a reasonable doubt.

We affirm.

_Mann, J._

WE CONCUR:

_Coburn, J._                    _Brennan, J._